UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
MILTON ABELES, INC.,

                Plaintiff(s),

        -against-

FARMERS PRIDE, INC.,
d/b/a/ BELL & EVANS,

                Defendant(s).
---------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
CV 03-6111 (DLI) (WDW)

**WILLIAM D. WALL, United States Magistrate Judge:**

      Before the undersigned, on referral from District Judge Irizarry, is a motion for summary

judgment by defendant Farmers Pride, Inc. ("Farmers Pride") seeking judgment in the amount of

$911,674.35 plus interest on its counterclaims and dismissing all claims by plaintiff Milton

Abeles, Inc. ("MAI"). For the reasons set forth herein, the undersigned recommends that the

motion be granted in part and denied in part.

## BACKGROUND

      Plaintiff MAI initiated this lawsuit in November 2003 in New York Supreme Court.

Defendant removed the case to this court in December 2003 on the basis of diversity jurisdiction,

and moved to dismiss. After defendant's motion was denied without prejudice, plaintiff filed an

amended complaint on August 11, 2004. Docket Entry ("DE") [35]. Defendant filed its answer

on August 18, 2004 and asserted counterclaims. DE [36].

      The causes of action arise from a business relationship gone sour. Plaintiff alleges

various counts of breach of contract, tortious interference with business relations, unfair

competition, and unjust enrichment. Defendant's counterclaim alleges causes of action for goods

sold and delivered and account stated. The material facts, drawn from the Amended Complaint

and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

Plaintiff MAI is a New York corporation engaged in the business of distributing meat and poultry. Defendant's Rule 56.1 Statement ("Def's Stmt") ¶1. Richard Abeles is the President and Chief Executive Officer of MAI. *Id.* Defendant Farmers Pride is a Pennsylvania corporation engaged in the production of fresh poultry products under the brand name "Bell & Evans." *Id.* ¶3. Scott Sechler is the Chairman and principal owner of Farmers Pride, and Bruno Schmalhofer is its Chief Executive Officer and Chief Financial Officer. *Id.*

From approximately 1982 until 2003, MAI distributed Farmers Pride products in the Long Island and metropolitan New York areas. Def's Stmt ¶4; Plaintiff's Rule 56.1 Counter Statement ("Pl's Stmt") ¶6. Farmers Pride distributed some products directly to two subdistributors of MAI, King Solomon Food, Inc. ("King Solomon") and Fort Meats, Inc. ("Fort Meats"). Def's Stmt ¶6. The bills for these direct deliveries were sent by Farmers Pride to MAI, which in turn billed and collected from the subdistributors. Farmers Pride also delivered "substantial product" directly to MAI. *Id.*

From 1997 to 2000, Farmers Pride and MAI did business pursuant to a written Distribution Agreement. *Id.* ¶5. That agreement, which expired in July 2000, was the only written agreement between the parties. During the remaining time periods, including mid-2000 to November 2003, all arrangements were oral. Defendant claims that these oral arrangements had no durational limit and that business was conducted on an "order-to-order" basis. *Id.* ¶4. Plaintiff characterizes their business transactions as being "performed under oral distribution agreements." Pl's Stmt ¶7.

The existence and scope of any oral agreement or agreements in effect after the expiration

of the written Distribution Agreement are key points of dispute in this case. By letter dated March 27, 2000, Farmers Pride notified MAI that it did not intend to renew the written agreement. Pl's Stmt, Ex. 2. That letter provided in part that Farmers Pride was "prepared to discuss with you possible arrangements for distribution of Bell & Evans product in the future, subject to a definitive agreement." *Id.* MAI responded in a letter dated April 7, 2000 that "[s]ince there no longer will be an obligation on your behalf to have an exclusive relationship with us, just so the record is straight, and there are no surprises 'down the road,' remember, at the same time, that there will no longer be any obligation on our behalf to have an exclusive relationship with you." Abeles Ltr, Def. Ex. 1. According to plaintiff, the parties entered into negotiations shortly after MAI sent its letter and ultimately agreed to an oral distribution agreement ("the 2000 oral agreement") to commence on July 15, 2000. Pl's Stmt ¶13.

Farmers Pride points to testimony from Richard Abeles to support its contention that no 2000 oral agreement was in effect between the parties, claiming that he could not establish any terms to the alleged agreement. *See* Defs' Stmt ¶¶11-15. Abeles testified that there was an oral agreement for "five to ten years" with no termination or renewal provisions. *Id.* ¶15. MAI points to additional testimony from Abeles regarding additional "terms and conditions" of the 2000 oral agreement. Pl's Stmt ¶15. Neither party claims that it continued performance under the same terms as those found in the 1997-2000 contract.

According to Farmers Pride, it experienced "payment problems" with MAI beginning in 2000. Def's Stmt ¶20. In May 2001, Farmers Pride wrote to MAI to re-establish its payment terms, which required MAI to make a payment every Monday for all invoices outstanding for the second prior week or earlier. *Id.* ¶21. Farmers Pride also claims that it received complaints from

King Solomon and Fort Meats about MAI's performance. *Id.* ¶22. Rather than get in the middle

of these disputes, Farmers Pride decided to give MAI a choice: either MAI could take delivery of

the product itself and leave Farmers Pride out of it, or Farmers Pride would directly deliver to

and bill the subdistributors, thus taking the business out of MAI's hands. *Id.* ¶26. To this end,

Farmers Pride wrote a letter to MAI on September 9, 2003 that stated, in pertinent part:

> Farmers Pride/Bell & Evans has decided to discontinue delivery of
> our products to Ft. Meats and King Solomon, unless we establish
> them as direct distributors
>
> Effective October 18, 2003, we will deliver product to you as a
> direct distributor. Of course you can maintain a sub-distributor
> relationship with them so long as MAI takes over deliver to them.

Def's Stmt ¶27. Letters conveying this information were also sent to King Solomon and Fort

Meats. *Id.*

In response to the September 9th letter, Farmers Pride received letters from MAI's

attorneys protesting the proposed change. Def's Stmt ¶30. Defendant states that as a result of

these letters, it made no change and maintained the status quo. *Id.* Despite the representations

made in the September 9th letter, no event of any significance occurred on October 18th. Between

September 9 and November 25, 2003, business was conducted as usual in that Farmers Pride

delivered product directly to King Solomon and Fort Meats and sent the bills to MAI. *Id.* ¶31.

MAI claims that business was not conducted as usual, however, in that Farmers Pride took steps

to establish direct relationships with the subdistributors. Pl's Stmt ¶¶46-48. MAI further states

that Farmers Pride revealed pricing information to the subdistributors and offered them the

opportunity to lower their costs by cutting MAI out. *Id.* ¶45.

In the time after receipt of the September 9th letter, MAI continued to make payments to

Farmers Pride, pursuant to a "long-established practice" whereby MAI sent a check by Federal Express for receipt by Farmers Pride each Monday in payment of any receivables over 14 days old. Def's Stmt ¶33. Through November 17th, MAI made payments every Monday and its account balance "hovered around $400,000." *Id.* ¶34. This balance was apparently not unusual in that MAI had a credit limit of $450,000, the amount of its credit insurance. *Id.* ¶7. On November 24th, in the week preceding Thanksgiving 2003, MAI's balance owed increased markedly to a total of $942,297.23. MAI did <u>not</u> make its usual weekly payment on November 24th. *Id.* ¶38.

MAI filed this lawsuit in New York Supreme Court on November 20, 2003; Farmers Pride received service on November 24th. Def's Stmt ¶36. On November 25th, Farmers Pride, "in light of the baseless lawsuit, the rapid run-up in MAI's receivables, its exceeding its credit limit, and the lack of a payment on November 24," advised MAI that it required a wire transfer of at least $300,00 in order to continue making shipments to MAI. *Id.* ¶39. Farmers Pride CEO Schmalhofer spoke with Richard Abeles who refused to make any payment. *Id.* Abeles instructed Farmers Pride to pick up any remaining poultry at the MAI facility, which Farmers Pride did. *Id.* ¶¶41-42. Farmers Pride credited MAI for the value of the returned poultry, leaving MAI with a balance owed of $911,674.35. *Id.* ¶49. Farmers Pride also seeks interest at the rate of 18% per annum, the rate indicated on its invoices. *Id.* ¶50.

MAI claims that pursuant to the alleged 2000 oral agreement, it sold Farmers Pride products exclusively and made expenditures in reliance on the business, such as the purchase of larger trucks. Pl's Stmt ¶¶32-34. MAI also claims that it provided Farmers Pride with "confidential customer and sub-distributor information as required" under the alleged 2000 oral

agreement. *Id.* ¶39. MAI alleges that Farmers Pride disclosed this information to sub-distributors in an attempt to cut MAI out of the business. *Id.* ¶45. MAI contends that the September 9th letter terminated the alleged 2000 oral agreement, and further disputes Farmers Pride's contention that business was conducted "as usual" between September 9th and November 24th, citing alleged actions taken by Farmers Pride in regard to the subdistributors. *Id.* ¶¶59-60, 62.

## DISCUSSION

### I. Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d

Cir. 1994)).  When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim."  *Jamaica Ash & Rubbish,* 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at 322)).  In opposing a motion for summary judgment, "[c]onclusory allegations, conjecture, and speculation are 'insufficient to create a genuine issue of fact.'" *Dienes Corp. v. Long Island Rail Road Co.,* No. 01-CV-4272, 2002 WL 603043, at *2 (E.D.N.Y. Mar. 19, 2002) (quoting *Kerzer v. Kingly Mfg*., 156 F.3d 396, 400 (2d Cir. 1998) (citations omitted)); *see also O'Hara v. Weeks Marine, Inc.,* 928 F. Supp. 257, 259 (E.D.N.Y. 1996) ("[c]onclusory allegations unsupported by factual data cannot raise a genuine issue for trial").  With these standards in mind, the court will separately consider the theories advanced by defendant in support of its motion for summary judgment.

**Rule 56.1 Statements**

Summary judgment motions in this district are subject not only to the standards applicable to Fed. R. Civ. P. 56(c), but to the Local Rules for the United States District Courts for the Southern and Eastern Districts as well.  Local Civil Rule 56.1 requires that both the movant and the opponent on a summary judgment motion submit statements of the material facts as to which they contend there are or are not genuine issues to be tried.  Loc. Civ. R. 56.1(a) & (b).  The rule provides that "papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue

to be tried." Loc. Civ. R. 56.1(b). The Local Rule further provides that the paragraphs set forth in the movant's Rule 56.1 Statement will be "deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph" in the non-movant's statement. Loc. Civ. R. 56.1(c). Each of the movant's and opponent's statements of fact must be followed by "citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Loc. Civ. R. 56.1(d).

MAI's Rule 56.1 Statement does not adhere to the corresponding paragraph requirement, and Farmers' Pride has argued that the motion for summary judgment should be granted on that ground. *See* Defs' Reply Mem. at 5 (citing, *inter alia*, *Folkes v. New York College of Osteopathic Medicine of New York Institute of Technology,* 214 F. Supp. 2d 273, 281 (E.D.N.Y. 2002) for proposition that "The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from [a non-corresponding] statement the pieces of evidence.") The court here declines to recommend that summary judgment be granted on the ground that MAI did not comply with the Local Rule, but notes that there are statements of fact by Farmers Pride for which the undersigned could not find corresponding statements of fact by MAI, and MAI must suffer the consequences of its failure to point to such facts and evidence.

## II.  Breach of Contract

The threshold issue facing the court is a determination of what, if any, contractual relationship existed between the parties in the fall of 2003. Both parties ask the court to decide whether the other has breached their agreement without a clear statement of what the agreement was. MAI and Farmers Pride clearly acted upon some sort of business arrangement since they transacted business for many years, with only three years of performance pursuant to a written

contract. There is no allegation that the parties continued to act pursuant to the terms of the contract that expired in July 2000. MAI claims that a new oral contract was negotiated and that it was a master distributor under an oral "master distribution agreement." Pl's Stmt ¶19. Farmers Pride claims that its agreement with MAI was not a contract, but was on an order by order basis and was terminable at will, or on reasonable notice.

There does not appear to be a choice of law issue in this case as both sides discuss New York law, and thus the court will proceed under the assumption that New York law applies. New York has two potentially applicable Statute of Frauds provisions. The more general one provides that an agreement "is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged wherewith. . . if such agreement . . . 1. By its terms is not to be performed within one year from the making thereof. . ." N.Y. Gen. Oblig. Law §5-701 ("GOL §5-701"). New York's Uniform Commercial Code applies specifically to the sale of goods and provides that for a contract to be enforceable, there must be "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. . ." N.Y. U.C.C. §2-201 ("UCC §2-201"). It is undisputed that no writing exists, "[a]ccordingly, unless the contracts fall within one of the exceptions to the Statute of Frauds, this cause of action must be dismissed." *United Magazine Co. v. Murdoch Magazines Distribution, Inc.,* 146 F. Supp. 2d 385, 403 (S.D.N.Y. 2001).

MAI's breach of contract cause of action is based upon the distribution relationship of the parties, not an individual sale of goods. As such, GOL §5-701 is the applicable Statute of Frauds provision. *See Paper Corp. v. Schoeller Technical Papers, Inc.,* 773 F. Supp. 632, 638 (S.D.N.Y. 2001); *Clarence Beverage, Inc. v. BRL Hardy (USA) Inc.,* 2000 WL 210205, at *2

(W.D.N.Y. Feb. 8, 2000).  Similar arguments would apply under UCC §2-201, which "has been held to apply to distributorship agreements which necessarily involve the purchase of more than $500 of goods."  *United Beer Distrib. Co. v. Hiram Walker Inc.,* 163 A.D.2d 79, 80-81 (1ˢᵗ Dep't 1990)(citations omitted).

Richard Abeles testified that the distribution agreement was to last "five to ten years."  R. Abeles Dep., Pl's Ex 34, 52:2-53:4, 61:18-62:8, 63:7-64:4.  This alleged provision alone establishes that the oral agreement could not be completed within one year and is thus unenforceable under GOL §5-701.  *See George Burke Co. v. Intermetro Indus. Corp.,* 268 A.D.2d 310 (1ˢᵗ Dep't 2000) (alleged oral agreement under which plaintiff was defendant's exclusive distributor for an indefinite time period found to be void under the Statute of Frauds). Courts have found oral agreements with seemingly indefinite durations capable of being 'performed' within a year, but only where one party made a specific representation that would allow that party to terminate the agreement by discontinuing the activities upon which the agreement was conditioned.  *See North Shore Bottling Co. v. C. Schmidt & Sons, Inc.,* 22 N.Y.2d 171 (1968); *Beautiful Jewellers Private Ltd v. Tiffany & Co.,* 2007 WL 867202, at *3 (S.D.N.Y. March 21, 2007).  In *North Shore Bottling Co.,* there was a specific allegation that the defendant beer manufacturer promised plaintiff that it would be the exclusive distributor "[f]or as long as Schmidt sold beer in the New York metropolitan area in which Queens County is located."  *Id.* at 174.  The Court found that the parties contemplated the agreement's "possible termination by action-unquestionably within the defendant's power to take at any time-discontinuing its beer sales in the New York area."  *Id.* at 176-77.  MAI has not claimed that one of the terms of the alleged agreement was that Farmers Pride promised that MAI would be the exclusive distributor

for as long as Farmers Pride sold its poultry in that specific area. MAI's list of the "terms and conditions of the 2000 oral distribution agreement" do not include any termination provisions whatsoever. The only "term" that could be construed as a termination provision would be MAI's assertion that the "term was to be at least so as long as Abeles marketed and complied with the parameters provided" by Farmers Pride. Pl's Stmt ¶15 (I). A general statement granting exclusive distribution rights "for as long as they satisfactorily distributed the product" calls for "performance of an indefinite duration and could only be terminated within one year by its breach during that period. As such the agreement fell within the Statute of Frauds and was void." *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d 449, 456-57 (1984).

Richard Abeles suggests that the agreement could be terminated by breach, *see* R. Abeles Dep., Pl's Ex 34, 52:2-53:4, or by unsatisfactory performance by MAI. *Id.* 49:24-50:3. "[T]ermination is not performance, but rather the destruction of the contract." *D & N Boening*, 63 N.Y.2d at 456-57 (citing *Blake v. Voigt,* 134 N.Y. 69, 72 (1892)). An agreement that provides for termination only in the event of unsatisfactory performance or breach "does not provide a permissible basis for concluding that the agreement could be performed within one year." *Zimmer-Masiello, Inc. v. Zimmer, Inc.,* 159 A.D.2d 363, 368 (1st Dep't 1990). Since it could not be performed within one year, the oral distribution agreement alleged by MAI is unenforceable unless it falls within one of the exceptions to the Statute of Frauds.

MAI does not claim that the alleged oral agreement could be performed within one year, but rather claims that Farmers Pride is estopped from asserting the Statute of Frauds based upon MAI's partial performance. "Part performance that is clear, certain and definite in object and design as to be unequivocally referable to the agreement, and which will precipitate a fraud if the

agreement is not enforced, removes the action from the defense of the statute of frauds." *Royal Air Maroc v. Servair, Inc.,* 603 F. Supp. 836, 841 (S.D.N.Y. 1985) (quoting *Marcraft Recreation Corp. v. Frances Devlin Co.,* 506 F. Supp. 1081, 1085 (S.D.N.Y. 1981)). This exception, however, "may be invoked only if plaintiff's actions can be characterized as unequivocally referable to the agreement alleged. . . . The actions alone must be unintelligible or at least extraordinary, *explainable only with reference to the oral agreement.*" *Blue Ridge Inv., LLC v. Anderson-Tully Co.,* 2005 WL 44382, at *4 (S.D.N.Y. Jan. 10, 2005) (emphasis added by S.D.N.Y.) (quoting *Anostario v. Vicinanzo,* 59 N.Y.2d 662, 664 (1983)). "[A]ctions that might well have been undertaken in fulfillment of the agreement but could also have been done for entirely different reasons are insufficient to prove the existence of the agreement." *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC,* 150 F.3d 194, 196 (2d Cir. 1998).

MAI fails to identify, let alone provide evidence for, any specific acts it took in part performance, simply concluding that "factual issues exist concerning Abeles' performance in reliance upon the Agreement that preclude summary judgment." Pl's Mem. in Opp. 7. The only arguably specific act put forth by MAI is that it "abandoned any attempt to distribute and market other poultry products" during the three years prior to Farmers Pride's "breach" in 2003. *Id.* at 6. The evidentiary support for this vague argument is Richard Abeles' deposition testimony that MAI maintained separate coolers for Farmers Pride's product, advertised that product, purchased larger trucks, invested its goodwill, and shared its customer and subdistributor information with Farmers Pride. R. Abeles Decl., ¶40-49. MAI does not present any argument as to how any of these alleged actions are unequivocally referable to the alleged oral distribution agreement in that

they are explainable only in reference to that alleged agreement. Although MAI claims to have distributed only Farmers Pride's poultry products, those products only account for approximately 20% of MAI's sales volume. Pl's Stmt ¶42. The actions referred to by Richard Abeles are one that any distributor would likely undertake if it were to distribute meat products generally, and do not support a conclusion that the <u>sole</u> reason MAI would have taken them was in reliance on a five or ten year distribution agreement to distribute Farmers Pride's poultry. "[I]f the performance can be 'reasonably explained' by any other possible reason than the alleged oral modification, the performance is equivocal" and the partial performance exception is unavailable. *Blue Ridge,* 2005 WL 44382, at *5 (citation omitted). As plaintiff's conduct and expenditures are explainable without reference to the alleged oral distribution contract, it may not assert partial performance, and the oral distribution agreement is unenforceable as a matter of law. Thus, defendant is entitled to summary judgment on the breach of contract claim.

## III. Implied Covenant of Good Faith and Fair Dealing

MAI's second cause of action is that Farmers Pride breached an implied covenant of good faith and fair dealing. Am. Comp. ¶¶36-43. "Under New York law, every contract contains an implied covenant of good faith and fair dealing." *Health & Cmty. Living, Inc. v. Goldis Fin. Group, Inc.,* 1998 WL 117928, at *5 (E.D.N.Y. March 13, 1998). However, "no implied duty of good faith and fair dealing may attach to an unenforceable contract." *Kreiss v. McCown DeLeeuw & Co.,* 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999). Since no enforceable contract exists, this cause of action must also be dismissed.

## IV. Tortious Interference with Economic Relationships

Plaintiff alleges two causes of action based on tortious interference–tortious interference

with contractual relationships and tortious interference with prospective economic relationships. Plaintiff views these as alternative claims, stating that Farmers Pride's actions with regard to MAI's subdistributors "would be an interference with existing contracts or alternatively, an interference with prospective business relations, depending on whether the contracts are held to be terminable-at-will." Pl's Mem. in Opp. 16. A contract that is terminable at will cannot be the basis for a tortious interference with contract claim, and "is actually a claim for tortious interference with prospective contractual relations." *AIM Int'l Trading, LLC v. Valcucine S.P.A.,* 2003 WL 21203503, at *6 n.12 (S.D.N.Y. May 22, 2003)(citations omitted). Thus the court must determine if there are material issues of fact regarding the question of whether contracts existed between MAI and its subdistributors, and if so, the nature of those agreements.

### A. Tortious Interference with Contractual Relationships

To prove a cause of action for tortious interference with a contract, the plaintiff must establish that (1) a valid contract(s) existed between MAI and its subdistributors; (2) Farmers Pride knew about the contract(s); (3) Farmers Pride intentionally interfered with the performance of the contract(s); and (4) damages resulted from the interference. *"21" Brands, Inc. v. R & J Emmet PLC,* 1990 WL 180136, at *4 (S.D.N.Y. Nov. 13, 1990). Additionally, Farmers Pride's actions must have been the "but for" cause of the breach of the other agreements. *Id.*

Of course, "[t]here can be no recovery unless there was a valid and enforceable contract." *AIM Int'l Trading,* 2003 WL 21203503, at *4 (citations omitted). There is no allegation that any written agreements existed between MAI and the subdistributors. MAI states, without citation to

any evidence[1], that "[t]he record demonstrates that oral distribution agreements existed between Abeles and the Sub-distributors whereby the latter received products directly from [Farmers Pride], and arranged for supply to retail customers." Pl's Mem. in Opp., 15. It is undisputed that the business practice was for both King Solomon and Fort Meats to take delivery of product directly from Farmers Pride for which Farmers Pride would invoice MAI. Presumably, King Solomon and Fort Meats would remit payment to MAI. Beyond the fact of this arrangement, however, the submissions before the court are almost completely devoid of any evidence regarding the relationship between MAI and the subdistributors. Richard Abeles claims that there was an oral agreement between MAI and King Solomon that was indefinite in term with no particular provision for termination. *See* R. Abeles Dep. 60:21-61:17. Abeles could not, however, recall any specific conversations with Bart Castellano, Fort Meats' Vice President, regarding the length of MAI's agreement with Fort Meats. *Id.* 67:19-24.

Farmers Pride claims that there was no contract of any sort between MAI and its subdistributors, or, "at best, it was indefinite and terminable at will." Def's Mem. of Law, 21. Farmers Pride points to testimony of Castellano from Fort Meats, and King Solomon's president, Steve Solomon, regarding the absence of contracts between those entities and MAI. Farmers Pride's letter to the subdistributors on September 9, 2003 gave those entities the option to take direct delivery of its product assuming that they did not have "any existing contractual agreements for the purchase of our products." Def. Ex. 3. In reference to this language, Solomon testified that "[w]e never had a contractual agreement, we never had a verbal

---

[1]Indeed all the citations to evidence to be discussed by the court in this section, *infra,* were provided by defendant.

agreement, we never had an agreement of any kind." Solomon Dep, 15:25-16:4. Castellano

stated that Fort Meats "had no contract with Abeles. We did business with Abeles on an order-

by-order basis." Castellano Decl. ¶2.

MAI cites *Italian & French Wine Co. of Buffalo, Inc. v. Negociants U.S.A.,* 842 F. Supp.

693, 700 (W.D.N.Y. 1993), for the proposition that distribution arrangements are not terminable

at will. MAI's reading of the case is rather simplistic. The court in that case concluded that

distributorship agreements "must be analyzed to determine whether they are merely a type of

employment contract which may be terminable at will, or whether they require commercial

activities which go further than an agreement for personal services." *Id.* at 699. The court went

on to analyze specific facts in that case, such as requirements that the subdistributor purchase

inventory, maintain warehouse space and advertise, before concluding that the agreement was not

terminable at will, but rather only after reasonable notice. *Id.* MAI has not presented any

evidence that would allow the court to make a similar determination in this case. While MAI is

correct that the record shows that a business relationship existed between MAI and the

subdistributors, the existence of such a relationship is not tantamount to the existence of a

contract. Further, even if the relationships are viewed as being based on oral contracts, the best

inference that the court can make is that such agreements were terminable at will and as such,

cannot form the basis for a cause of action for tortious interference with contract.

### B. Tortious Interference with Prospective Economic Relationships

MAI claims that Farmers Pride "pressured, induced, and otherwise coerced King

Solomon and Fort, and other customers/sub-distributors to be discovered, by putting severe and

undue economic pressure on them, to cease doing business with and/or reduce their business

relationship with the Plaintiff," and that it "threatened not to do business" with the subdistributors. Am. Compl. ¶¶52, 53. In doing so, plaintiff alleges that defendant "acted to advance its own competing interests with the sole purpose of eliminating Plaintiff as the Master Distributor." *Id.* ¶55.

This tort is "variously referred to throughout case law as tortious interference with business advantage, business relations, economic relations, and prospective economic advantage," but has the same elements whatever it is called. *PPX Enter., Inc. v. Audiofidelity Enter., Inc.,* 818 F.2d 266, 269 (2d Cir. 1987). To state a claim, plaintiff must establish: (1) business relations with a third party; (2) defendant's interference with those business relations; (3) that defendant acted with the sole purpose of harming the plaintiff or that where defendant acted to advance its own competing interests, used dishonest, unfair or improper means, such as criminal or fraudulent conduct; and (4) injury to the relationship. *Universal Marine Med. Supply, Inc. v. Lovecchio,* 8 F. Supp. 2d 214, 221 (E.D.N.Y. 1998). Such a claim is "very difficult to sustain. It must meet requirements 'more demanding than those for interference with [the] performance of an existing contract.'" *Kramer v. Pollock-Krasner Found.,* 890 F. Supp. 250, 258 (S.D.N.Y. 1995) (citation omitted).

To establish a claim for tortious interference with prospective economic advantage, plaintiff must show that defendant "intentionally interfered with an existing business relationship between plaintiff and a third-party, and that the interference was motivated solely by malice or employed by criminal or fraudulent means." *Huntington Dental & Med. Co. v. Minnesota Mining and Mfg Co.,* 1998 WL 60954, at *4 (S.D.N.Y. Feb. 13, 1998)(citation omitted). The claim requires an allegation that "the action complained of was motivated solely by malice or to

17

inflict injury by unlawful means rather than by self-interest or other economic considerations."
*Kramer,* 890 F. Supp. at 258.

In response to Farmers Pride's argument that MAI had to show tortious or criminal conduct to prevail in this cause of action, MAI states that Farmers Pride fails to recognize the appropriate law that a plaintiff "may show interference with business relations if conduct occurred '*either* with the sole purpose of harming the plaintiff *or* by means that are dishonest, unfair or in any other way improper.'" Pl's Mem. in Opp., 16 (emphasis in original)(citation omitted). Contrary to MAI's current argument that there are two, alternative ways of establishing interference with business relations, its amended complaint attempts to combine them by alleging that Farmers Pride "acted to advance its own competing interests with the sole purpose of eliminating Plaintiff as the Master Distributor." Am. Compl. ¶55. MAI now argues that "[i]n the present case, the record demonstrates that [Farmers Pride] acted solely to harm" MAI, Pl's Mem. in Opp., 17, but provides no evidence to support the conclusion. Plaintiff has not provided any evidence at this advanced stage of the proceedings to allow a finding that defendant acted with the sole purpose of harming it.

"If the interference complained of 'is intended, at least in part, to advance one's own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct.'" *Huntington Dental,* 1998 WL 60954, at *4 (quoting *PPX Enter., Inc.,* 818 F.2d at 269); *see also Kahn v. Salomon Bros. Inc.,* 813 F. Supp. 191, 195 (E.D.N.Y. 1993) ("where a defendant's conduct is intended even partially to advance its own interests, the misconduct must rise to the level of fraudulent or criminal acts"). In an apparent attempt to claim that Farmers Pride actions were dishonest or fraudulent, MAI argues that Farmers Pride's acts constitute

"fraudulent behavior" and that Farmers Pride violated its duty of fiduciary care owed to MAI by virtue of the parties' confidential relationship. Pl's Mem. in Opp., 18. Farmers Pride states that this argument is being raised for the first time on this motion and that there is no evidence to support such claims. Def's Reply Mem., 9. The court agrees with defendant's characterization. The complaint does not allege fraud and plaintiff may not belatedly add such a claim given the requirement that fraud be pleaded with particularity. Fed. R. Civ. P. 9(b). Plaintiff's cause of action for tortious interference with prospective economic relationships must be dismissed.

## V. Unfair Competition/Conversion Claim

MAI claims that it was required to disclose its list of customers and subdistributors to Farmers Pride. Am. Compl. ¶59. Further, MAI alleges that it was required to build good will in the market toward Farmers Pride's products, that it did so, and that once such good will was established, Farmers Pride "converted said good will" and the customer information for its own use. *Id.* ¶¶60-63. Plaintiff characterizes this cause of action as one for unfair competition and conversion.

"A claim for unfair competition 'requires allegations of unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor, and talent.'"*Huntington Dental,* 1998 WL 60954, at *6 (quoting *Greenblatt v. Prescription Plan Serv. Corp.,* 783 F. Supp. 814, 825 (S.D.N.Y. 1992)). MAI alleges that Farmers Pride converted the distribution lists to its own use after MAI expended efforts to create the lists. Farmers Pride has not provided any evidence to dispute this allegation. In fact, the lone piece of evidence put forth by Farmers Pride is Richard Abeles' testimony that he thought Farmers Pride wanted the information for its website and that therefore MAI did not consider the information to be confidential. This evidence alone is

insufficient to support a finding that Farmers Pride is entitled to judgment as a matter of law. Accordingly, defendant's motion for judgment on this cause of action is denied.

## VI.  Unjust Enrichment/Quantum Meruit Claim

Part of MAI's final cause of action for unjust enrichment/quantum meruit also concerns the alleged taking and use of MAI's list of customers/subdistributors.  MAI further alleges that it "expended substantial time and effort to build and promote good will" toward Farmers Pride's products, and to establish a distribution network for Farmers Pride, and that MAI has not been compensated for these services.  Am. Compl. ¶¶68-70.

To establish a claim for unjust enrichment, plaintiff must prove that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant to make restitution.  *Huntington Dental,* 1998 WL 60954, at *6.  Richard Abeles testified that he expanded Farmers Pride's market in that he helped to develop "a way to sell some of these larger chains and maintain the competitive nature of the independent butcher," R. Abeles Dep. 132:15-133:3, and that he generated specific business with Stop & Shop. *Id.* 45:20-46:5.  Farmers Pride claims that it was not unjustly enriched because it "never requested and/or required MAI to 'build up' Farmer's Pride's goodwill."  Def's Mem. of Law, 23-24.  The court finds that there are material issues of fact in regard to this cause of action and thus, defendant's motion is denied.

## VII.  Goods Sold and Delivered

Farmers Pride has asserted counterclaims for goods sold and delivered, account stated and quantum meruit regarding amounts owed by MAI for poultry orders it received but for which it never paid.  As a threshold issue, MAI claims that this counterclaim cannot be resolved at this

juncture since its claims and the defendant's counterclaims "arise under the same contract and stem from the same transaction" and must be determined together since any sums due "are readily offset by the damage due to [MAI] as a result of the breaches of our agreement.  Pl's Stmt ¶137.  Farmers Pride counters that under UCC §2-717, "a buyer may offset its claim against the purchase price <u>only</u> if the claim arises from a breach of the <u>same</u> contact."  Pl's Mem. of Law, 14 (emphasis in original).  Here, Farmers Pride argues, MAI's breach of contract claim arises out of the "distribution" agreement, which defendant alleges is different from the sale of goods via invoices.  *Id.*  Although "a buyer may defeat or diminish a seller's substantive action for goods sold and delivered by interposing a valid counterclaim for breach of the underlying sales agreement," *Created Gemstones, Inc. v. Union Carbide Corp.,* 47 N.Y.2d 250, 255 (1979), the undersigned has determined, *supra*, that there is no enforceable distribution contract and thus no viable claim for breach.  Accordingly, MAI's argument that Farmers Pride's counterclaim for goods sold and delivered is inextricably intertwined with MAI's breach of contract claim cannot prevail, and the court may address whether summary judgment on the counterclaim is appropriate.

Farmers Pride states that as of November 24, 2003, MAI owed it a balance totaling $942,297.23.  Def's Stmt ¶35.  By letter dated November 25, 2003, Richard Abeles instructed Farmers Pride to "immediately make arrangements to pick up any inventory of Bell & Evan's products" currently in MAI's possession.  Def. Ex. 13.  Farmers Pride retrieved this product and credited MAI for its value, leaving MAI with a balance owed of $911,674.35.  Def's Stmt ¶42.  It is this amount, plus interest calculated at 18%, that Farmers Pride seeks to recover.  The principal amount sought is supported by the invoices submitted by defendant.  Def. Ex. 17.

MAI states that it "disputes the principal amount alleged to be due," Pl's Stmt ¶104, citing as evidence Richard Abeles' Declaration that MAI "disputes the principal amount alleged to be due." R. Abeles Decl. ¶135. Beyond this clearly self-serving statement, MAI presents no evidence to contradict the amounts set forth in the invoices. The court finds that there is no issue of material fact in regard to the principal amount of $911,674.35 owed by MAI.

Of the total amount owed, MAI claims that it is owed $229,372.54 from three subdistributors for shipments made directly to them by Farmers Pride. Pl's Stmt ¶110. As evidence for this statement, plaintiff again cites Richard Abeles' declaration, R. Abeles Decl. ¶152, which again simply re-states the "fact" without citation to any additional evidence, such as unpaid invoices. Even if plaintiff had sufficiently established that it is owed monies from its subdistributors, that fact alone would not affect Farmers Pride's entitlement to payment for goods sold and delivered. It is undisputed that it was the practice of the parties for Farmers Pride to directly deliver product to some subdistributors and send the invoices to MAI for payment. Farmers Pride admits that as to the final shipments made by it directly to the subdistributors, it "requested, but did not demand, that the two subdistributors hold their payment to MAI pending a request to MAI that they pay Farmers Pride direct and reduce MAI's obligation to Farmers Pride by the amount of the payment." Def's Stmt ¶46. After MAI refused this request, however, Farmers Pride told the subdistributors to "do whatever they deemed in their best interests with respect to their payment obligations to MAI." *Id.* Farmers Pride further cites evidence from the subdistributors regarding those entitities' willingness to satisfy their obligations to MAI in exchange for releases. *See* Solomon Dep., 52:18-53:6; Castellano Decl. ¶5. As discussed *supra,* there is almost no evidence in the record regarding the contractual relationship between MAI and

its subdistributors.  Whether MAI ultimately prevails upon whatever claims it may have against its subdistributors does not change the fact that it received product valued at $911,674.35 from Farmers Pride for which it has never remitted payment.

Farmers Pride further claims it is entitled to interest on the amounts owed calculated at the rate of 18%.  It bases this argument on language found on the invoices in question: "TERMS: NET 7 DAYS AFTER INVOICE DATE.  A SERVICE CHARGE OF 1-1/2% PER MONTH NOT TO EXCEED 18% SIMPLE INTEREST PER ANNUM CHARGED ON BALANCES MORE THAN 30 DAYS OVERDUE COMPUTED UNTIL RECEIPT OF PAYMENT."  Def's Ex. 17.  MAI claims that this provision was never enforced and that some of the stated terms are directly contradicted by testimony from Farmers Pride.  For example, despite the printed term that payments were due "net 7 days," Farmers Pride's Chief Financial Officer acknowledged that as a practical matter, it collected "by the 19th day on all invoices that are outstanding 14 days or more."  Schmalhofer Decl. ¶3.  Other evidence refers to a payment term that exceeded seven days indicated on the invoice, such as a letter from Farmers Pride's President that states payments were to be due "by Monday for the second prior shipment week."  Sechler Ltr, Def's Ex. 7.

It is also significant that Farmers Pride did not customarily charge MAI any interest, let alone 18%, on unpaid invoices.  *See, e.g., Music Sales Corp. v. Mark Music Serv. Ltd.,* 194 A.D.2d 470, 471 (1st Dep't 1993) (inappropriate to assess interest at rate indicated on invoices where it was not seller's custom to charge interest).  MAI has raised an issue of material fact as to whether it was the custom for Farmers Pride to charge 18% interest on its unpaid invoices.  Thus, the court concludes that Farmers Pride is entitled to judgment in the principal amount of

$911,674.35, plus interest at an as yet undetermined rate.[2]

## CONCLUSION

The undersigned recommends that defendant's motion for summary judgment be granted as to plaintiff's claims for breach of contract, implied covenant of good faith and fair dealing, tortious interference with contractual relationships, and tortious interference with prospective economic relationships, and denied as to plaintiff's claims for unfair competition/conversion and unjust enrichment/quantum meruit. It is further recommended that defendant's motion for summary judgment on its counterclaims be granted in the amount of of $911,674.35, plus interest at an as yet undetermined rate.

## OBJECTIONS

A copy of this Report and Recommendation is being sent to counsel for all parties by electronic filing. Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 10 days of the date of entry. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. §636 (b) (1); Fed. R. Civ. P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
      March 30, 2007

                                   /s/ William D. Wall         
                                   WILLIAM D. WALL
                                   United States Magistrate Judge

---

[2]The court notes that substitution of the statutory interest rate might be appropriate. *See, e.g., Music Sales Corp.,* 194 A.D.2d at 471 (modifying judgment by assessing statutory interest instead of rate stated on face of invoice).